IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Crim. No. 03-91-SLR |
| ) | |
| ANDRE HUGGINS, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM ORDER**

**I. INTRODUCTION**

Defendant Andre Huggins ("Huggins") moves for a new trial pursuant to Fed. R. Crim. P. 33(b)(1) on the basis of newly discovered evidence. (D.I. 207, 233) Plaintiff United States of America has filed its opposition, to which defendant has filed replies. (D.I. 211, 234) Although represented by counsel, defendant's pro se filings have been accepted and considered.[1] (D.I. 237, 240-244, 246-248) The court has jurisdiction pursuant to 18 U.S.C. 3231. For the reasons that follow, defendant's motion is denied.

**II. BACKGROUND**

---

[1]Defendant has submitted numerous pro se letters addressing the pending motion, forfeiture proceedings and his dissatisfaction with his current counsel. Although defendant has expressed a desire to proceed pro se, his attorney has not withdrawn as counsel. Because of defendant's articulated concerns with his representation, the court permitted defendant's pro se filings. (D.I. 235) A similar course was followed after the verdict, when defendant and trial counsel dissolved their relationship. (D.I. 179, fn.3; D.I. 164)

Following a nine day jury trial, defendant was found guilty on six counts, and not guilty on ten counts, of an indictment charging him with various drug trafficking and money laundering offenses.[2] Pursuant to Fed. R. Crim. P. 29(c), defendant filed a motion for judgment of acquittal as to each count of his conviction. A hearing on the motion was held on June 8, 2005. (D.I. 178) By memorandum opinion and order dated July 8, 2005, the court found sufficient evidence to support the jury's verdict and granted plaintiff's application for forfeiture in the amount of $292,000. (D.I. 179, 180) Sentencing was scheduled for August 4, 2005. (D.I. 176)

The day preceding sentencing, defendant's trial counsel withdrew their appearance and a new attorney of record entered. (D.I. 185, 190) Sentencing was postponed until September 20, 2005 to allow counsel adequate time to prepare. (D.I. 185, 191) On September 19, 2005, defendant moved to postpone the sentencing to allow more time to review the record in order to respond to the presentence investigation report. (D.I. 203) Sentencing was rescheduled to November 10, 2005.

---

[2]On October 12, 2004, a federal grand jury returned a third superseding indictment with notice of forfeiture against defendant. (D.I. 80) On January 24, 2005, the jury found defendant guilty of counts II, XII, XIII, XIV, XVI and XVII. He was found not guilty of counts III, IV, V, VI, VII, VIII, IX, X, XI and XV. The jury was unable to reach a verdict on count I. (D.I. 126)

2

On November 4, 2005, defendant moved for a new trial based on evidence discovered after the trial. (D.I. 207) Specifically, defendant submitted: (1) an affidavit purportedly authored by Melvin Barner ("Barner");[3] (2) a private investigator's report ("Shelar report");[4] (3) DEA reports;[5] and (4) an affidavit of Joseph Sy Smithers ("Smithers").[6] (D.I. 207,

---

[3]Barner was a witness for the prosecution. At trial, he admitted being a paid confidential informant for the Drug Enforcement Administration ("DEA") and that, in late June 2002, his working relationship with the DEA was terminated because he had provided false information. (D.I. 120 at 201-203) Barner further testified that he approached defendant in defendant's store on February 19, 2002 and began talking about buying cocaine. Defendant gave Barner his phone number and told Barner to call him that evening because a friend was coming to town. As Barner was leaving the store, Ricardo Rogers entered. Barner knew Rogers from prison, but he was not aware that Huggins knew Rogers or that Rogers sold drugs.

[4]This November 1, 2005 memo is presumably written by Tom Shelar to Katrina Jones, defendant's sister. Shelar reports interviewing Barner in prison on October 24, 2005 and that Barner told him about a drug transaction with Rogers. Shelar wrote:
> He did do a deal with [Rogers] 2 days later, and told [Rogers] it would be a weekly deal. He did state to [Rogers] "Tell Flip [defendant] I'll give him a holler"- Barner did know that [defendant] knew [Rogers]. He advised that the police told him to act like he had lost [Roger's] phone number, to go back to [defendant]. Barner did this, and [defendant] called [Rogers'] cell phone, and gave the phone to Barner.

(D.I. 207, ex. B)

[5]The DEA reports contain information about Jermaine Franklin, defendant's co-defendant, and Jermaine Hall. (D.I. 207, ex. C, D)

[6]In a notarized statement, Smithers avers that his conversations with defendant were not about cocaine or cocaine deals. Smithers did not testify. By reading a newspaper account of the trial, Smithers learned that his conversations with

3

exs. A-E) Barner's affidavit ("Affidavit 1") contained averments that he had lied at trial and did so pursuant to a script prepared by government attorneys and agents.[7] In Affidavit 1,

---

defendant were taped by law enforcement and played in the courtroom. (D.I. 207, ex. E)

[7]In pertinent part, Affidavit 1 provides:
> I was given "a script to memorize" as to what I needed to say as my testimony during trial. That these statements were false and not true, and due to the governments' (sic) and agents instructions, I unwillingly and dishonestly made these false statements at Andre Huggins trial.
> On February 19, 2002, I did not discuss with Andre Huggins, in any way, shape or form, my desire to purchase cocaine, specifically 4 ½ ounces of cocaine for $3,500.
> On February 19, 2002, I only discussed sports, with Andre Huggins. I never gave Andre Huggins my phone number, but he did give me his, written down on a piece of paper in which I turned over to agents. Huggins never said, "a friend was coming to town and maybe it could happen later that night," That's why I never called him that night.
> Ricardo Rogers, whom I had previously known to sell drugs before February 19, 2002, is who I had the conversation about wanting to purchase 4 ½ ounces of cocaine for $3,500. I did not run into Ricardo Rogers "inside the store" as I was leaving, but "two blocks up the street as I left the shop."
> As I was walking down the street away from the shop, I ran into Rogers as he was coming up the street. I and Ricardo Rogers had a 5-10 minute conversation, in which I told him my desire to purchase "4 ½ ounces of cocaine for $3,500."
> Rogers told me he could take care of me, and then gave me his phone number. I, in turn, gave Rogers my phone number. When Rogers called, he never mentioned Andre Huggins, or that Andre Huggins directed him to call me and take care of me.
> When Rogers and I completed the deal, I never once thought that the deal was through via Huggins, but that it was Rogers himself.

(D.I. 207, ex. A)

4

Barner further explained that he was revealing this information to "correct and make right some false statements" he made about defendant. (Id. at ex. A)

Defendant contends that Affidavit 1 proves Ricardo Rogers[8] and Barner negotiated and consummated the drug transaction without his assistance or involvement. Had the jury considered Affidavit 1, along with police surveillance reports documenting their conversation outside of defendant's store, defendant submits there is a strong likelihood that a different verdict would have resulted.

Plaintiff claims Affidavit 1 is a forgery and has produced a second Barner affidavit ("Affidavit 2"),[9] wherein Barner denies

---

[8]Rogers, a separately indicted co-conspirator, was a cooperating witness for the prosecution. Rogers testified that he and defendant were partners in the cocaine trafficking business. (D.I. 121 at 86-198) Rogers pled guilty to four counts of an indictment charging him with drug violations and is currently awaiting sentencing. United States v. Ricardo Rogers, Crim. No. 03-097-SLR. (D.I. 17, 18)

[9]The affidavit provides:
> I have reviewed a document [Affidavit 1], which purports to be an affidavit concerning the Huggins trial signed by me on September 19, 2005. . . I first saw and learned of the content of [Affidavit 1] on November 29, 2005 when it was shown to me by Special Agent David Hughes. [Affidavit 1] appears to be signed by me. However, I did not write or authorize the text of [Affidavit 1], and did not knowingly sign it. I did not authorize anyone to sign [Affidavit 1] on my behalf. With regard to my testimony at the Huggins trial, I was not given a script to memorize as to what I needed to say at

5

writing or authorizing anyone to write or sign Affidavit 1 on his behalf. (D.I. 211, ex. 1) Barner states that his testimony was truthful.

Considering that "a conviction obtained by knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury," an evidentiary hearing was ordered to resolve this dispute. United States v. Agurs, 427 U.S. 97, 103 (1976). (D.I. 230) The scope of the hearing was limited to "whether Melvin Barner testified truthfully at defendant's trial." (D.I. 217)

Two days before the hearing, defendant requested a continuance, in part, because the private investigator who submitted the Shelar report would be unavailable due to "health problems which necessitated a doctor's appointment and testing, which he could only arrange on March 2, 2006." (D.I. 224) The postponement request was denied.

III. **HEARING**

---

        the trial, by the prosecutors, agents, or any other representative of the federal government. I testified truthfully at trial. I was not asked to testify untruthfully at trial as to any matter at the behest of the prosecutors, agents, or any other representative of the federal government.
(D.I. 211, ex. 1)

6

Barner testified as the only witness for the prosecution.[10] (D.I. 230) He denied writing and giving anyone the authority to write Affidavit 1. (Id. at 30-311) Barner testified that he was not given a script to memorize as what needed to be said in his testimony. (Id. at 31) Barner stated that his testimony at defendant's trial was truthful to the best of his recollection at the time. (Id.) He did admit, however, that he signed a blank piece of paper, which later became Affidavit 1. (Id. at 30) He denied reading or reviewing Affidavit 1 before it was shown to him by Special Agent Hughes. (Id.)

Barner explained the circumstances surrounding Affidavit 1. After being found guilty of an unrelated offense, he was incarcerated at the Howard Young Correctional Center in Wilmington. (Id. at 8) Defendant was also incarcerated there. Within a week of Barner's incarceration, an unknown inmate delivered a letter to him. (Id.) The letter, written by defendant, requested any information about the prosecuting attorneys, case agents, as well as the events about which Barner testified at trial. (GX1) Barner did not respond to the letter. (Id. at 11)

A few days later, Barner was approached by another unknown inmate on behalf of defendant. This inmate asked Barner specific questions and wrote the answers on a pink piece of paper. (Id. at

---

[10]Defendant testified as the only witness for the defense.

7

12) Within days, Barner received a letter in the mail from defendant. (GX2) The letter had been sent by defendant's sister and contained an unsigned affidavit for Barner to sign. Barner did not sign it because he "was not going to lie." (Id. at 16)

Subsequently, Barner was called down to the infirmary, even though he was not sick. (Id. at 17) Defendant was also present at the infirmary and spoke with Barner. Defendant told Barner that a visit between the two of them had been arranged for the following week, so the two could continue their conversation. (Id. at 20) When called out for the visit, Barner pretended he had lost all privileges and was prohibited from leaving his pod. (Id. at 21) Barner concocted this story because he was tired of being bothered by defendant and his questions. (Id. at 21, 42)

The next day, an unidentified correctional officer called Barner out of his pod to an area where defendant was waiting to speak with him. (Id. at 22) Defendant asked Barner if he signed the affidavit that he had sent. (Id. at 23) Barner lied and said he had not signed the affidavit because the prison notary was not available. At the suggestion of the correctional officer, defendant gave Barner a blank piece of paper to affix his signature. (Id. at 24) Barner signed his signature because he felt there was nothing defendant could accomplish with it because his sentencing was scheduled for the following day. (Id.) He elaborated further that, "when you are labeled a

8

snitch, rat, whatever, you know what I mean, sometimes you feel as though your freedom, your health, whatever, is in jeopardy. And a lot of times you'll do anything just to like get out of that situation." (Id. at 40)

Despite counsel's attempt to expand the scope of the hearing to include what transpired between defendant, Barner and Rogers on February 19, 2002, the examination of the witnesses was limited to whether Barner provided false testimony at trial. (Id. at 33) To that end, although Shelar was not available to testify, the court left open the possibility that post trial briefing might necessitate having another hearing to allow defendant the opportunity to present Shelar's testimony. (Id. at 110) Similarly, defendant was permitted to submit transcripts of certain tapes during post-hearing briefing.

### IV. STANDARD OF REVIEW

Federal Rule of Criminal Procedure 33 allows a court, upon motion of a defendant, to grant a new trial to that defendant if required in the interest of justice. United States v. Brennan, 326 F.3d 176, 189 (3d Cir. 2003). Motions for new trial based on newly discovered evidence must demonstrate:

> (a) the evidence must be in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on, must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as

9

> that, on a new trial the newly discovered would probably produce an acquittal.

United States v. Iannelli, 528 F.2d 1290, 1292 (3d Cir. 1976); United States v. Jasin, 280 F.3d 355, 361 (3d Cir. 2002). All five requirements must be established before a trial court may grant a new trial on the basis of newly discovered evidence. United States v. Saada, 212 F.3d 210, 216 (3d Cir. 2000). The movant has a difficult burden of satisfying these requirements. United States v. Ashfield, 735 F.2d 101, 112 (3d Cir. 1984).

## V. DISCUSSION

### A. Barner and Tape N15

Considering Barner's testimony, with particular attention to his demeanor and manner, the court finds credible his assertion that he did not testify pursuant to a script prepared by government attorneys or agents. Instead, he testified truthfully and to the best of his recollection at the time. Moreover, Barner's assertion that he signed a blank Affidavit 1, and without reading or reviewing the final document, is plausible considering the circumstances surrounding his contact with defendant. Specifically, it is reasonable to infer that, as a prosecution witness against defendant, Barner felt uncomfortable about being incarcerated at the same facility as defendant. As evidenced by the repeated contact with unknown inmates and the manipulation of infirmary and visitation calls, the fact that both were housed in different housing areas did not provide the

10

segregation necessary for this inherently adversarial relationship. As a result, any statements or conduct Barner made while incarcerated with defendant are suspect and less believable than his testimony given under oath and in open court. Because Barner's testimony persuasively repudiated the allegations in Affidavit 1, there is no newly discovered evidence to consider as grounds for a new trial.

Since defendant claimed that an audio tape not played at trial by the prosecution demonstrated that the drug transaction occurred between Barner and Rogers exclusively and buttressed the allegations in Affidavit 1, the court ordered it produced.[11] (D.I. 251; D.I. 230 at 73) After listening to N15 multiple times in tape and CD form, it remains difficult to discern the identities of the speakers, the contents of their conversations, or the location of same. It is undisputed that this tape was provided to the defense before trial and that, presumably, the defense trial strategy did not include using the tape. (D.I. 230 at 81, 93-94)

Considering tape N15 against <u>Iannelli</u> and its progeny, defendant's argument for new trial on this basis fails. Significantly, defendant's counsel had the tape before trial and defendant was present and knew what occurred between him and

---

[11]Defendant's attorney produced N15 in cassette tape form and defendant's sister submitted N15 in CD form. (D.I. 253, 254)

11

Barner. The tape could have been used to impeach Barner at trial. Whether this was an appropriate trial strategy is inconsequential at this juncture because a motion for new trial based on newly discovered evidence is not a proper vehicle for bringing claims for ineffective assistance of counsel. United States v. McLaughlin, 89 F. Supp.2d 617, 629 (E.D. Pa. 2000); United States v. DeRewal, 10 F.3d 100, 104 (3d Cir. 1993). Nonetheless, the tape, at best, is impeachment material and not of such a compelling nature to produce an acquittal.

**B.  Smithers Notarized Statement**

Defendant submits Smithers notarized statement to demonstrate that their taped conversations were not about drug transactions. Under Iannelli, this is not newly discovered evidence because the tapes were provided to defendant before trial and, as a party to the conversations, defendant knew with whom he was conversing and could have called Smithers as a trial witness. Moreover, Smithers' affidavit only contradicts prosecution testimony and does not provide an alternate explanation of their discussions.

**C.  Jermaine Franklin and Jermaine Hall**

Defendant asserts that certain DEA reports demonstrate that a confidential informant was talking about Jermaine Hall and not Jermaine Franklin. This casts doubt on the existence and the length of the conspiracy between Franklin and defendant, as well

12

as the quantity of drugs possessed. Considering that this issue was addressed extensively at pretrial and found to be cumulative and immaterial, it is not newly discovered evidence under Iannelli.

### D. Shelar Report

Considering the conclusions reached regarding Barner and Affidavit 1, it is unnecessary to consider Shelar's report to defendant's sister.

### VI. CONCLUSION

At Wilimington this 19th day of July, 2006,

IT IS ORDERED that defendant's motion for new trial is denied. (D.I. 207)

IT IS FURTHER ORDERED that defendant's sentencing hearing is scheduled for **Monday, August 21, 2006** at **10:00 a.m.** in courtroom 6B, on the sixth floor of the J. Caleb Boggs Federal Building, 844 King Street, Wilmington, Delaware. **Present counsel shall represent defendant through sentencing. No further extensions of time shall be granted.**

_____
United States District Judge

13